# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

TINA SMITH, individually and as next )
of friend and lawful heir of RAYMOND )
A. SMITH JR., deceased; )
)
                Plaintiff, )
)
v. ) Case No. 14-00785-CV-W-SWH
)
MICHAEL KILGORE, et al. )
)
                Defendants. )

## I. BACKGROUND

Pending before this Court is Defendants' Motion For Summary Judgment and Suggestions In Support (doc. #70). On December 23, 2014, plaintiff filed her First Amended Complaint naming four individual officers[1], the members of the Kansas City Board of Police Commissioners[2], and the Kansas City Chief of Police[3] as defendants. Plaintiff alleged the following causes of action: (I) excessive force in violation of the Fourth Amendment and 42 U.S.C. §1983; (II) establishment of an official policy allowing the use deadly force by failing to adequately train, discipline, sanction and supervise officers with respect to the constitutional rights of citizens in violation of the Fourth Amendment and 42 U.S.C. §1983; (III) battery; (IV) assault; (V) state law claims for negligent hiring and retention; (VI) wrongful death pursuant to

---

[1] Officers Selvir Abidovic Christopher Krueger, Christopher Taylor and Andrew Keller.
[2] Board members Alvin Brooks, Angela Wasson-Hunt, Michael Radar, Mayor Sly James and David Kenner.
[3] At the time the First Amended Complaint was filed, the Chief of Police was Darryl Forte. Darryl Forte was sued in his official capacity as Chief of Police. (Doc. #3, at ¶10) Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Richard C. Smith is automatically substituted for Darryl Forte.

Mo. Rev. Stat. § 537.080; (VII) failure to provide access to medical care in violation of 42 U.S.C. §1983; and (VIII) establishment of an official policy and custom of providing inadequate medical care to those in police custody in violation of 42 U.S.C. §1983. (Doc. #3) At the end of each count, plaintiff asked for judgment against defendants, jointly and severally.

On December 20, 2015, this Court granted defendants' motion to dismiss Count V of the First Amended Complaint which alleged state claims for negligent hiring and retention. (Doc. #25) Defendants now bring a motion for summary judgment on the remaining claims.

## II. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48. "Material facts" are those "that might affect the outcome of the suit under the governing law," and a dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the absence of any genuine issue of material fact. Olson v. Pennzoil Co., 943 F.2d 881, 883 (8th Cir. 1991). If the moving party meets its initial burden, the nonmoving party must then produce specific evidence to demonstrate genuine issues for trial. Id. When the burden shifts, the nonmoving party may not rest on the allegations in its pleadings, but must set

forth, via citation to material in the record, specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(c)(1); Stone Motor Co. v. Gen. Motors Corp., 293 F.3d 456, 465 (8th Cir. 2002). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991). The Court may not weigh the evidence in the record, decide credibility questions or determine the truth of factual issues, but merely decides if there is evidence creating a genuine issue for trial. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).

### III. UNDISPUTED FACTS

In her responsive pleading, plaintiff denies a number of Defendants' Undisputed Material Facts and provides citations to support such denials. Most of the citations do not directly controvert defendants' facts. (See for example the discussion on page 11-12, infra) The Eighth Circuit has repeatedly stated that "in opposing a motion for summary judgment, a nonmoving party may not rely on mere denials or allegations in its pleadings, but must designate specific facts showing that there is a genuine issue for trial." Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003); see also Brandt v. Davis, 191 F.3d 887, 891 (8th Cir. 1999) (finding that a party's failure to "submit even a shred of evidence" to contradict evidence presented by the movant required the Court to find the facts, as presented by the movant, uncontroverted). Because plaintiff has failed to submit any evidence contradicting Defendants' Undisputed Material Facts, the following facts are uncontroverted:

1. Plaintiff Tina Smith is the mother of the deceased, Raymond Smith. [Doc. #3, at ¶5] (Defendants' Undisputed Material Facts (hereinafter "DUMF") #1)

2. Officers Selvir Abidovic, Andrew Keller, Christopher Krueger, and Christopher Taylor are Kansas City Police Department (hereafter "KCPD") police officers and employees of the Kansas City, Missouri Board of Police Commissioners (hereafter "the Board"), and were so at the time of this shooting. [Doc. #3, at ¶¶16-19] (DUMF #2)

3. On May 26, 2012, Officers Abidovic, Keller, Krueger, and Taylor were in full uniform. [Doc. #70-1 (Def. Ex. A), at ¶3; Doc. #70-6 (Def. Ex. C), at ¶2; Doc. #70-7 (Def. Ex. D), at ¶2] (DUMF #3)

4. Also on that day, Officers Abidovic and Keller were partners and in the same marked patrol car; and Officers Krueger and Taylor were partners and in the same marked patrol car. [Doc. #70-6, at ¶2; Doc. #70-7, at ¶2; Doc. #70-1, at ¶3] (DUMF #4)

5. Richard C. Smith is the current Chief of Police for the KCPD. Darryl Forte was the Chief of Police for the KCPD at the time of this shooting. [Doc. #3, at ¶9] (DUMF #5, modified)

6. The Board, through its members, Alvin Brooks, Angela Wasson-Hunt, Michael Rader, and Mayor Sly James, operates the KCPD. [Doc. #3, at ¶¶6-7] (DUMF #6)

7. On May 26, 2012, at approximately 4:00 p.m., Officers Abidovic and Keller were dispatched on a report of a black male, a black female, and a white female involved in suspicious prostitution activity, inside the park, at 542 Park Avenue, Kansas City, Missouri. [Doc. #70-4 (Def. Ex. A-2), at time stamp 00:27 to 00:50; Doc. #70-6, at ¶3; Doc. #70-7, at ¶3] (DUMF #7)

8. Officer Abidovic saw a black male (later identified as, and herein after referred to as, Raymond Smith) sitting on a wall inside the park, speaking to a white female. [Doc. #70-7, at ¶5] (DUMF #8)

9. He suspected Mr. Smith and the white female were the subjects of the suspicious prostitution, because they fit the general description from the dispatcher (a black male and white female), they appeared to be together, and they were the only ones inside the park. [Doc. #70-7, at ¶6] (DUMF #9)

10. Wanting to speak to them, Officer Abidovic walked toward them; but they walked away. [Doc. #70-7, at ¶7; Doc. #76-3, at 6:6-12] (DUMF #10)

11. This heightened Officer Abidovic's suspicions that they were the subjects of the reported prostitution. [Doc. #70-7, at ¶8] (DUMF #11)

12. Officer Abidovic yelled at them, "stop, come and talk to me." [Doc. #70-7, at ¶9; Doc.#76-3, at 52:13-23] (DUMF #12)

13. Mr. Smith looked back at Officer Abidovic, and then ran out of the park, which further heightened Officer Abidovic's suspicions that Mr. Smith was the subject of the reported prostitution. [Doc. #70-7, at ¶10; Doc. #76-3 (Pl. Ex. 3), at 6:10-12 and 8:5-8] (DUMF #13)

14. Officer Abidovic pulled his taser and chased after him on foot. [Doc. #70-7, at ¶11] (DUMF #14)

15. Officer Keller radioed dispatch the general description of Mr. Smith (black male wearing a blue shirt) and location of the foot pursuit (northbound from 542 Park). [Doc. #70-6, at ¶5; Def. Ex. A-2, at 4:46 to 5:06] (DUMF #15)

16. He then got back in the patrol car and drove it around the block, in an attempt to get ahead of Mr. Smith to block his path of escape. [Doc. #70-6, at ¶5; Doc. #70-9 (Def. Ex. F), at 4:11:48 to 4:12:50] (DUMF #16)

17. Officers Krueger and Taylor were dispatched to the area of 542 Park, to assist. [Doc. #70-1, at ¶4; Doc. #70-2 (Def. Ex. A-1), at 1; Def. Ex. A-2, at 4:46 to 5:06] (DUMF #17)

18. While pursuing Mr. Smith, Officer Abidovic saw a gun in his right hand. [Doc. #70-7, at ¶12] (DUMF #18)

19. Officer Abidovic pointed his gun at Mr. Smith and yelled, "Drop the gun!" [Doc. #70-7, at ¶13] (DUMF #19)

20. Mr. Smith looked back at Officer Abidovic, did not drop his gun, and then walked into a funeral home parking lot, near 542 Park. [Doc. #70-7, at ¶14] (DUMF #20)

21. Officer Abidovic immediately got on dispatch radio and said, "He's armed! Hold the air!" [Doc. #70-7, at ¶15; Doc. #70-1, at 1; Doc. #70-4, at time-stamp 5:38 to 5:40] (DUMF #21)

22. En route with lights and siren, Officer Krueger heard Officer Abidovic report, "He's armed! Hold the air!" over dispatch radio. [Doc. #70-1, at ¶5] (DUMF #23)

23. Officer Krueger knew that a "hold-the-air" request means that no other officers get on the air so that an officer has immediate, unencumbered use of the radio to call for assistance. [Doc. #70-1, at ¶6] (DUMF #24)

24. Based on his training, Officer Krueger knew "hold-the-air" requests are made in unpredictable and dangerous situations. [Doc. #70-1, at ¶7] (DUMF #25)

25. Officer Abidovic made the "hold-the-air" request because the situation was unpredictable and dangerous. [Doc. #70-7, at ¶17] (DUMF #26)

26. Officer Abidovic followed Mr. Smith into the funeral home parking lot. [Doc. #70-7, at ¶19; Doc. #70-9, at time-stamp 4:12:58 to 4:13:00] (DUMF #27)

27. Officer Keller drove into the funeral home parking lot, in a semi-circle arc in front of Mr. Smith, in an attempt to block his path. [Doc. #70-6, at ¶10; Doc. #70-9, at time-stamp 4:12:58 to 4:13:07] (DUMF #28)

28. Believing Mr. Smith may shoot Officer Keller, Officer Abidovic warned, "Keller, he's got a gun!" [Doc. #70-7, at ¶22; Doc. #70-9, at time-stamp 4:13:07] (DUMF #29)

29. Officer Keller yelled at Mr. Smith, "Drop the gun! Drop the gun!" [Doc. #70-6, at ¶13; Doc. #70-9, at time-stamp 4:13:07 to 3:13:10] (DUMF #30)

30. Mr. Smith ran to a chain-linked fence with his gun still in his hand. [Doc. #70-6, at ¶14; Doc. #70-7, at ¶23; Doc. #70-9, at time-stamp 4:13:14 to 4:13:20] (DUMF #31)

31. En route, Officer Krueger heard Officer Keller report on dispatch radio, "We got him. We're in the funeral parking lot. He's got a gun in his hands. 690 [the police helicopter] over to your left. Black male he's gonna jump the fence." [Doc. #70-1, at ¶9; Doc. #70-2, at 2; Doc. #70-4, at time stamp 6:16 to 6:24] (DUMF #32)

32. As Mr. Smith climbed over the fence, he pointed his gun at Officer Abidovic, who was about 20 yards away, and fired a shot at him. [Doc. #70-7, at ¶24; Doc. #70-9, at time-stamp 4:13:20 to 4:13:25] (DUMF #33)

33. Officer Abidovic immediately jumped behind a garage in the funeral home parking lot for cover. [Doc. #70-7, at ¶25; Doc. #70-9, at time-stamp 4:13:20 to 4:13:27] (DUMF #34)

34. Fearing for his safety and the safety of other officers, Officer Abidovic fired his gun at Mr. Smith three times. [Doc. #70-7, at ¶26; Doc. #70-9, at time stamp 4:13:24 to 4:13:28] (DUMF #36, modified)

6

35. Officer Abidovic then lost sight of him. [Doc. #70-7, at ¶27] (DUMF #37)

36. Still en route, now driving northbound on Brooklyn Avenue, about a block from 542 Park, Officers Krueger and Taylor saw the police helicopter overhead and heard Officer Keller radio dispatch, "Shots fired. Shots fired." [Doc. #70-1, at ¶11; Exhibit A-1, at 2; Doc. #70-8 (Def. Ex. E), at time-stamp 4:13:38 to 4:13:39; Doc. #70-5 (Def. Ex. B), at 7:20-21] (DUMF #38)

37. Seconds later, Officers Krueger and Taylor, still driving northbound on Brooklyn Avenue, near the south entrance of the funeral home, saw Mr. Smith standing at a fence with a gun in his hand. [Doc. #70-1, at ¶16; Doc. #70-5, at 7:25-8:2; Doc. #70-8, at time-stamp 4:13:48 to 4:13:50] (DUMF #39)

38. Officer Krueger immediately stopped his patrol car on Brooklyn Avenue, cutting off Mr. Smith's eastbound path of escape. [Doc. #70-1, at ¶17; Doc. #70-8, at time-stamp 4:13:48 to 4:13:53] (DUMF #40)

39. Before his patrol car came to a complete stop, Officer Krueger, now about five to seven yards from Mr. Smith, saw Mr. Smith look at him and Officer Taylor, then start to raise his gun in their direction. [Doc. #70-1, at ¶¶ 18, 20] (DUMF #41)

40. Officer Krueger shot at Mr. Smith five times. [Doc. #70-1, at ¶¶21, 24; Doc. #70-8, at time-stamp 4:13:52 to 4:13:56] (DUMF #43, modified)

41. Officer Krueger stopped shooting when he saw Mr. Smith falling backward with his gun no longer pointed in his and Officer Taylor's direction. [Doc. #70-1, at ¶25] (DUMF #44)

42. After Mr. Smith fell to the ground, Officer Abidovic called for an ambulance on dispatch radio ("Order EMS. Party's been shot"). [Doc. #70-7, at ¶29; Doc. #70-2, at p. 2] (DUMF #45)

43. The ambulance arrived within three minutes of getting the request and immediately began assisting Mr. Smith. [Doc. #70-10 (Def. Ex. G), at 8:7-24] (DUMF #46)

44. Officer Taylor never fired his weapon. [Doc. #70-5, at ¶8:2-7) (DUMF #47, modified)

45. Less than two minutes had expired between the time Officer Abidovic first radioed dispatch that Mr. Smith was armed and when Mr. Smith was fatally shot. [Doc. #70-7, at ¶30] (DUMF #48, modified)

46. Officer Keller never fired his weapon during the incident with Mr. Smith. [Doc. #70-6, at ¶19] (DUMF #49, modified)

IV. CONCLUSIONS OF LAW

In most cases, individual defendants seeking summary judgement on claims of excessive force or denial of adequate medical care by state officials analyze their entitlement to summary judgment under the qualified immunity doctrine. Although the individual defendants raised the issue of qualified immunity in their answer to the First Amended Complaint, they did not mention qualified immunity at any point in their summary judgment briefing. Accordingly, the Court will address the issues as presented by the parties[4].

A. Excessive Force and Related Claims

In Count I, plaintiff alleges that Officers Abidovic and Krueger subjected Mr. Smith to excessive and unreasonable force in violation of the Fourth Amendment. (Doc. #3, at ¶51) Plaintiff further alleges that all four officers subjected Mr. Smith to "physical pain, humiliation, embarrassment, and anxiety" when the officers dragged and rolled Mr. Smith's body in order to

---

[4] Qualified immunity is immunity from suit rather than a defense to liability. See Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L.Ed.2d 565 (2009). The pending motion for summary judgment appears to couch defendants' entitlement to relief as one based on a defense to liability, not immunity from suit. The substantive analysis of the constitutional rights does not differ between the two approaches. However, the two approaches have significant procedural differences pertaining to the burden of proof and the right to an interlocutory appeal. These differences, however, would have been material only if the Court had denied defendants' motion for summary judgment. Having ruled in favor of defendants on their motion and suggestions, which was presented as a defense to liability, the Court need not resolve the issue of whether it should apply the qualified immunity doctrine in the absence of a specific request in the summary judgment pleadings.

handcuff Mr. Smith and that Officers Taylor and Keller failed to intervene to prevent the excessive and unreasonable force in violation of the Fourth, Eighth and Fourteenth Amendments to United States Constitution. (Doc. #3, ¶¶57-58)  Plaintiff also alleges that the Board is vicariously liable for defendants' conduct. (Doc. #3, ¶63)  In Count II, plaintiff brings a Monell claim for failure to train and for establishing an "official policy, custom and/or action regarding pursuit of suspects, following of orders, and the use of deadly force . . . ." (Doc. #3, at ¶¶72-80)  In their motion for summary judgment, defendants argue that the officers used objectively reasonable force and that the plaintiff has failed to identify a policy or custom at issue and therefore judgment in their favor should be entered. (Doc. #70, at 9-12)

The United States Supreme Court has held "that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . . Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (U.S. 1989).  Courts determining whether a seizure is objectively reasonable look at the facts and circumstances confronting the officer at the time. Aipperspach v. McInerney, 766 F.3d 803, 806 (8th Cir. 2014).  Courts "should consider such factors as the severity of a suspected crime, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting or evading arrest." Nelson v. Cty. of Wright, 162 F.3d 986, 990 (8th Cir. 1998).  Furthermore, courts must take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham 490 U.S. at 397, 109 S. Ct. at 1872.  The Eighth Circuit has found that "[a] threat to an officer's safety can justify the use of force in cases involving relatively minor crimes

9

and suspects who are not actively resisting arrest or attempting to flee." Brown v. City of Golden Valley, 574 F.3d 491, 497 (8th Cir. 2009).

The undisputed facts clearly show that officers believed Mr. Smith to have a gun. Undisputed Facts ("UF") ##18, 21, 22, 28, 29, 31, 32, 37, 39, supra. Furthermore, the undisputed facts show that officers believed Mr. Smith had fired his gun at officers. UF ##32, 36, supra. While officers were dispatched to the scene for a non-violent offense, the situation became more dangerous when Mr. Smith ran from police and a gun was not only observed, but Mr. Smith was observed shooting the gun at police. In such circumstances, the officers' use of deadly force was reasonable.[5] See Partlow v. Stadler, 774 F.3d 497, 502 (8th Cir. 2014) (finding that the officers' use of deadly force was reasonable under the circumstances where officers knew the descendant had a shotgun and had appeared to aim a gun in their direction). Furthermore, while Officer Krueger did not provide any warning of the use of force, such a warning is not required. See Loch v. City of Litchfield, 689 F.3d 961, 967 (8th Cir. 2012) (finding that the lack of a warning does not make the use of force unreasonable).

Plaintiff contends that one of the issues that precludes summary judgement is whether Raymond Smith actually had a gun. (Doc. #75, at 1) In furtherance of her argument, plaintiff asserts that there are numerous eyewitnesses who state that Mr. Smith did not have a gun and that the dashcam videos from two police cars do not show that Mr. Smith had a gun. (Doc. #75, at 12) The evidence cited to, however, does not create a genuine issue of material fact. None of

---

[5] In determining whether the officers' use of force was excessive, the Court has listened to and considered Officer Krueger's dashcam recording. Officer Krueger admits, and the audio recording confirms, that that while he was driving to the scene he stated "Shoot that m-----f-----!" (Doc. #70-1, at ¶13) After carefully reviewing the dashcam recording from Officer Krueger's car, it is clear that the statement was made after Officer Abidovic states that Mr. Smith had a gun, but before Officer Keller states "Shorts fired. Shots fired." (Doc. #70-8) Nevertheless, this statement does not contradict the other undisputed evidence that requires granting Officer Krueger's motion for summary judgment.

the witnesses directly contradict Officer Abidovic's statements that Mr. Smith fired his gun at him while jumping the fence. Nor do the witnesses' statements directly contradict Officers Abidovic's, Kruger's and Taylor's affidavits and testimony that they each saw Mr. Smith with a gun. Instead the witnesses' testimony only shows that those individual witnesses did not see a gun.

With the exception of the female in the park, whose location at the time of her observations is unknown, none of the witnesses were at the same vantage point as the officers. Even the responding officers did not initially see a gun. It was only after the foot chase ensued that a gun was observed. One witness was initially inside her house on Brooklyn Avenue when she heard gunshots and then exited her house onto her porch where she heard additional gunshots. (Doc. #76-14, at 1-2) Her statement was only that she did not observe Mr. Smith with a gun. (Doc. #76-14, at 2) Another witness was situated on the east side of Brooklyn Avenue at the corner when she saw Mr. Smith run south behind a funeral home with an officer chasing him. (Doc. #76-7, at 1) The witness continued to observe the chase and saw Mr. Smith jump one fence and try to jump another fence but was shot. (Doc. #76-7, at 1) The witness stated that she never saw Mr. Smith with a gun.[6] (Doc. #76-7, at 1) The helicopter observer stated that he saw something tucked underneath Mr. Smith's arm but could not tell what it was.[7] (Doc. #76-9)

The last witness relied upon by the plaintiff was the female who was with Mr. Smith in the park prior to the time that Mr. Smith ran from the officers.[8] She stated that she never saw

---

[6] It should be noted that the witness' statement is double hearsay because it is a statement of the witness recorded by a police officer in an incident report. See Walker v. Wayne Cty., Iowa, 850 F.2d 433, 435 (8th Cir. 1988) (finding reports not taken verbatim and not sworn to be inadmissible hearsay).

[7] See footnote #6, supra.

[8] While plaintiff offered Exhibit 10, defendants have provided the description of the woman that can be heard in the video and plaintiff has not disputed the description.

Mr. Smith with a weapon. (Pl. Ex. #10) Her statement, however, is not a statement to police, but instead a video recording purportedly at the police station where she is not in view of the camera but can be overheard talking with another individual. The discussion does not provide any context as to the point in time when she made this observation, how close she was to Mr. Smith or whether she was even in a position to determine whether he possessed a gun. These as well as the other witness statements merely amount to the individual witnesses not seeing a gun. Therefore, plaintiff has not provided anything to this Court that contradicts the officers' version of events. Furthermore, while not specifically cited by either party, the additional evidence submitted by plaintiff also shows that Mr. Smith had a gun. (See e.g. Doc. #76-3, at 34:5-16; Doc. #76-11, at 25:17-23, 26:12-25 and 27:1-6; Doc. #76-11, at 45:2-3)

Finally, the dashcam video is grainy and not at the right angle to clearly determine whether Mr. Smith had a weapon. As the Court in Mann v. Yarnell, 497 F.3d 822 (8th Cir. 2007), noted, an order granting a motion for summary judgment cannot be avoided by "offer[ing] a dark and often unintelligible video coupled with an entirely speculative and wishful recitation of events that is neither substantiated by anything displayed in the video nor by the memory of any observer or participant present at the altercation." Mann v. Yarnell, 497 F.3d 822, 827 (8th Cir. 2007).

Plaintiff also brings excessive force claims against Officers Keller and Taylor alleging that the officers failed to intervene. (Doc. #3, at ¶58) While officers may be liable for failing to intervene in an excessive force claim, such liability is dependent upon whether the use of force was unconstitutional. Nance v. Sammis, 586 F.3d 604, 612 (8th Cir. 2009). Because this Court has found that Officers Abidovic's and Krueger's use of force was not unconstitutional, Officers Taylor and Keller are also entitled to summary judgment.

In Count I, plaintiff also alleged that the Board is vicariously liable for the officers' conduct under the doctrine of respondeat superior. (Doc. #3, at ¶63) A governmental entity cannot be found liable under a theory of respondeat superior or vicarious liability in a §1983 claim. City of Canton, Ohio v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989). Therefore, plaintiff's claim against the Board in Count I must be dismissed.

Nevertheless, claims may be brought against a governmental entity that raise a failure to train or allege a governmental policy or custom that inflicts injury. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978). Such a claim is often referred to as a Monell claim. Plaintiff has brought such a claim in Count II. Where, as in the instant case, there has been a finding of no constitutional violation by the individual officers involved, a failure to train argument under Monell cannot survive. Sanders v. City of Minneapolis, Minnesota, 474 F.3d 523, 527 (8th Cir. 2007). Furthermore, plaintiffs raising a Monell claim based on a particular policy or custom must specify the policy or custom at issue. Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 674 (8th Cir. 2007). Plaintiff in the instant case has failed to identify a specific policy or custom that is constitutionally insufficient. Therefore, the Board and the Chief of Police are entitled to summary judgement with regard to Counts II.

### B. Assault, Battery and Wrongful Death Claims

Plaintiff also alleges claims for battery (Count III), assault (Count IV), and wrongful death (Count VI). (Doc. #3, at ¶¶81-91, 99-104) In their motion for summary judgment, defendants argue that the officers did not use more force than reasonably necessary. (Doc. #70, at 12) Defendants also argue that sovereign immunity bars any claims against the Board and the Chief of Police. (Doc. #70, at 12)

Missouri courts require that "a plaintiff asserting that he was [assaulted and] battered in the course of an arrest must prove that the officer used unreasonable force in effecting it." Neal v. Helbling, 726 S.W.2d 483, 487 (Mo. Ct. App. 1987). As noted in section A, supra, the officers' use of force was reasonable. Therefore the officers cannot be held liable for an assault and battery and are entitled to judgment in their favor.

Additionally, the claims against the Board and the Chief of Police must be dismissed because the Board and Chief of Police are entitled to sovereign immunity under Missouri Revised Statute §537.600. As a governmental entity, the Board and the Chief of Police are entitled to sovereign immunity unless one of the specified waivers found in the statute applies. Fantasma v. Kansas City, Mo., Bd. of Police Comm'rs, 913 S.W.2d 388, 391 (Mo. Ct. App. 1996); Green v. Missouri, 734 F. Supp. 2d 814, 846 (E.D. Mo. 2010); Betts-Lucas v. Hartmann, 87 S.W.3d 310, 327 (Mo. Ct. App. 2002) (finding that "[s]overeign immunity, if not waived, bars suits against employees in their official capacity, as such suits are essentially direct claims against the state."). Section 537.600 provides only two exceptions to the broad grant of sovereign immunity: 1) the motor vehicle exception wherein the injury must have resulted from a public employee's operation of a motor vehicle and 2) the dangerous condition exception wherein the injury occurred due to a dangerous condition on a public property. §537.600.1 RSMo. Neither of those exceptions has been pled in this matter. Therefore, the allegations against the Board and the Chief of Police must be dismissed.

C. Failure to Provide Medical Care

In Count VII, plaintiff alleges that defendants Abidovic, Krueger, Taylor and Keller "deprived Raymond Smith of his right for medical care and treatment in violation of 42 U.S.C. §1983 and the Eighth Amendment to the Constitution of the United States." (Doc. #3, at ¶107)

Plaintiff alleges in Count VIII that the Board and the Chief of Police failed to institute adequate policies, customs and/or actions regarding the provision of medical treatment for those in the control or custody of the Kansas City Police Department in violation of 42 U.S.C. §1983 and the Eighth Amendment to the Constitution of the United States. (Doc. #3, at ¶¶113-19)

First, although not directly argued by the parties, it should be noted that the Eighth Amendment has no application in this matter. The Eight Amendment applies only to individuals who have been formally adjudicated guilty. City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983); see also Walton v. Dawson, 752 F.3d 1109, 1117 (8th Cir. 2014). Thus, the Court will address these claims pursuant to the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment.[9]

A plaintiff alleging that his due process rights were violated when police officers failed to provide medical care and treatment must show that "he suffered an objectively serious medical need, and that the deputies had actual knowledge of those needs but deliberately disregarded them." Carpenter v. Gage, 686 F.3d 644, 650 (8th Cir. 2012). Where the allegations stem from a delay in treatment, there must be some showing that the delay had a detrimental effect. Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997).

The undisputed facts show that Officer Abidovic called for Emergency Medical Services (hereafter "EMS") for Mr. Smith upon seeing Mr. Smith being shot and observing Mr. Smith fall to the ground. UF #42, supra. Plaintiff argues that EMS was not called for two minutes after Mr. Smith was shot. (Doc. #75, at 14) In support of her argument, plaintiff cites the dashcam footage

---

[9] This Court notes that "the due process analysis applicable in this situation parallels that under the Eighth Amendment, because pretrial detainees are entitled to the same protection as imprisoned convicts. Davis v. Or. Cnty., Mo., 607 F.3d 543, 548 (8th Cir.2010)." Carpenter v. Gage, 686 F.3d 644, 650 (8th Cir. 2012).

15

from Officer Krueger's car. (Doc. #75, at 14)  That footage alone, however, does not provide a clear picture of when EMS was called.

When viewed in conjunction with the audio of the dispatch call and the transcript of the dispatch call, the timeline becomes much clearer.  The audio of the dispatch call shows that at time-stamp 00:06:10 an officer can be heard stating "He's armed! Hold the air!" (Def. Ex. A-2, at time stamp 00:06:10)  The transcript identifies the officer as Officer Abidovic. (Doc. #70-2, at 1)  The audio portion of Officer Krueger's dashcam video shows that at time stamp 04:12:42, Officer Krueger is driving and an officer can be heard stating "He's armed! Hold the air!" (Def. Ex. E and Pl. Ex. 12[10], at time stamp 04:12:42)  An officer, identified as Officer Keller on the transcript, can be heard stating "Shots fired. Shots fired" at 00:06:33 on the audio of the dispatch call and at time stamp 04:13:38 on Officer Krueger's dashcam video. (Def. Ex. A-2, at time stamp 00:06:33; Def. Ex. E, at time stamp 04:13:38)  On the dashcam video, Mr. Smith can be seen standing at the fence at time stamp 04:13:49. (Def. Ex. E, at 04:13:49)  Shortly thereafter, shots can be heard on the dashcam video.  At 00:07:34 on the dispatch call and at 04:14:38 on the dashcam video an officer, identified as Officer Abidovic on the transcript, can be heard stating "Order EMS. The party's been shot." (Def. Ex. A-2, at 00:07:34; Doc. #70-2, at 2; Def. Ex. E, at time stamp 04:14:38)  At the time Officer Krueger fired his gun at Mr. Smith, he was five to seven yards downhill from Mr. Smith. (Doc. #70-1, at ¶¶18, 22)  After he fired his weapon, Officer Krueger ran up the hill to Mr. Smith and ordered Mr. Smith to drop his gun. (Doc. #70-1, at ¶26)  Officer Krueger then placed handcuffs on Mr. Smith. (Doc. #70-1, at ¶26)  In reviewing all the evidence, including the daschcam footage and the dispatch call, it appears that less than a minute elapsed between the time Mr. Smith was shot and when EMS was

---

[10] Defendants' Exhibit A-2 and Plaintiff's Exhibit 12 both contain the dashcam video from Officer Krueger's patrol car. Hereafter, the Court will solely refer to Def. Ex. E.

ordered. Therefore, this Court finds that there was no delay by the officers in calling for EMS services. Furthermore, even if there was a delay, plaintiff has failed to show that such a delay caused the death of Mr. Smith.

For these reasons, the Court finds that there is no genuine dispute as to any material fact with regard to Count VII, and defendants' motion for summary judgment must be granted as to this count of the First Amended Complaint. Furthermore, because the actions of the individual officers did not violate the Constitution, the Board and the Chief of Police cannot be liable for failing to properly train the officers. Carpenter, 686 F.3d at 651. Therefore the motion for summary judgment with regard to Count VIII must also be granted.

Based on the foregoing, it is

**ORDERED** that Defendants' Motion For Summary Judgment and Suggestions In Support (doc. #70) is **GRANTED**.

                                                */s/ Sarah W. Hays*
                                                SARAH W. HAYS
                                UNITED STATES MAGISTRATE JUDGE